[Civil No. 2420.  Filed April 24, 1926.]

[245 Pac. 677.]

THE CITY OF TOMBSTONE, OF THE STATE OF ARIZONA, a Municipal Corporation, and O. GIBSON, Mayor, Dr. H. HOUSTON HUGHART, C. W. SCHNEIDER, P. H. KNOLES, R. V. SAUNDERS, Councilmen, and R. V. SAUNDERS, City Clerk of Said City, Appellants, v. J. H. MACIA, Appellee.

1. TAXATION.—Taxes may not be levied for private purposes.

2. TAXATION—NEITHER ELEMENT OF PROFIT NOR NOVELTY DETERMINE WHETHER BUSINESS IS FOR "PUBLIC PURPOSE"; TRUE TEST BEING WHETHER WORK IS ESSENTIALLY PUBLIC AND FOR GENERAL GOOD.—Neither existence of element of profit nor novelty determine whether business is for a "public purpose"; the true test being whether the work is essentially public and for the general good of all of the inhabitants, satisfying their need or contributing to their convenience, rather than merely for gain or for private objects.

3. TAXATION—IN DETERMINING WHAT IS A PUBLIC PURPOSE, COURT WILL CONSIDER CLIMATE AND THE AGE.—In determining what is a public purpose, the court will consider the climate and also the age, as what is a public purpose is a question changing with industrial inventions and developments and to meet new social conditions.

4. MUNICIPAL CORPORATIONS—ISSUANCE OF BONDS TO ESTABLISH MUNICIPAL ICE PLANT HELD FOR "PUBLIC PURPOSE" (CONST., ART. 9,

---

1. See 26 R. C. L. 41.

3. See 19 R. C. L. 722.

4. Right of municipal corporation to sell ice, see note in 31 L. R. A. (N. S.) 117.

§ 1).—Issuance of bonds to establish municipal ice plant for the sale of ice to the inhabitants of municipality is for public purpose, within Constitution, article 9, section 1, limiting taxation to public purposes.

5. STATUTES.—The object of all interpretation and construction of statutes is to ascertain the probable meaning and intention of the legislature.

6. MUNICIPAL CORPORATIONS.—Legislature has no need to declare forms of business in which municipalities may engage, as that has been declared by Constitution, article 13, section 5, and article 2, section 34, which legislature cannot modify.

7. MUNICIPAL CORPORATIONS—MUNICIPALITIES HELD AUTHORIZED TO ISSUE BONDS ONLY FOR STATED PURPOSES (CONST., ART. 2, § 34, ART. 13, § 5; LAWS 1912 [SP. SESS.], CHAP. 11; CIV. CODE 1913, PAR. 2035; LAWS 1921, CHAP. 31).—Laws of 1912 (Sp. Sess.), chapter 11, providing municipalities might engage in any business for which they might grant a franchise and issue bonds enacted under Constitution, article 13, section 5, re-enacted, in substance, by Civil Code of 1913, paragraph 2035, and by Laws of 1921, chapter 31, after constitutional amendment (article 2, section 34), providing every municipality might engage in industrial pursuits, *held* to authorize issuance of bonds by municipalities in cases provided only, as power to engage in business does not give power to issue negotiable instruments and bonds.

8. MUNICIPAL CORPORATIONS — STATUTE AUTHORIZING ISSUANCE OF BONDS FOR LAWFUL PURPOSE HELD NOT REPEALED (ACTS 1921, CHAP. 31; LAWS 1913 [THIRD SP. SESS.], CHAP. 90; CIV. CODE 1913, PAR. 2035; LAWS 1913 [THIRD SP. SESS.], CHAP. 20; CIV. CODE 1913, PAR. 5285; LAWS 1912 [SP. SESS.] CHAP. 11; CONST., ART. 2, § 34, ART. 13, § 5).—Acts of 1921, chapter 31, extending right to issue bonds granted in Laws of 1912 (First Sp. Sess.), chapter 11, modified by Laws of 1913 (Third Sp. Sess.), chapter 90 (Civ. Code 1913, par. 2035), to municipalities engaged in any business for which they may grant a franchise under Constitution, article 13, section 5, did not repeal Laws of 1913 (Third Sp. Sess.), chapter 20 (Civ. Code 1913, par. 5285), authorizing issuance of bonds for any lawful purpose, in view of Constitution, article 2, section 34.

9. STATUTES.—Repeals by implication are not favored.

10. MUNICIPAL CORPORATIONS—BOND ISSUE FOR MUNICIPAL ICE PLANT HELD AUTHORIZED (ACTS 1881, No. 39, § 1, ART. 2, SUBD. 9; LAWS 1913 [THIRD SP. SESS.], CHAP. 20; CIV. CODE 1913, PAR. 5285; CONST., ART. 2, § 34; CIV. CODE 1913, PARS. 5266–5285).—Municipal ice plant for the sale of ice to the inhabitants *held* within

---

5.   See 25 R. C. L. 961.

the power of city of Tombstone by its charter, Acts of 1881, No. 39, section 1, article 2, subdivision 9, and by Constitution, article 2, section 34, and bond issue therefor complying with Civil Code of 1913, paragraphs 5266–5285, is authorized by Laws of 1913 (Third Sp. Sess.), chapter 20, and Civil Code of 1913, paragraph 5285.

---

See (1) 37 Cyc., p. 719, n. 2. (2) 37 Cyc., p. 720, n. 9. (3, 4) 12 C. J., p. 780, n. 98; 37 Cyc., p. 720, n. 9, p. 722, n. 19 New. (5–7) 28 Cyc., p. 1576, n. 56 New; 36 Cyc., p. 1106, n. 29, p. 1148, n. 32. (8, 9) 36 Cyc., p. 1071, n. 25, p. 1079, n. 44. (10) 28 Cyc., p. 1577, n. 66.

APPEAL from a judgment of the Superior Court of the County of Cochise. Gerald Jones, Judge. Reversed and remanded.

Mr. O. Gibson, for Appellants.

Mr. J. T. Kingsbury, for Appellee.

INGRAHAM, Superior Judge.—This is an injunction suit in which a citizen and taxpayer of the City of Tombstone seeks to enjoin that city and certain officers thereof from executing and delivering to certain bidders the coupon bonds of that municipality. The proposed bonds were to be issued for the purpose of raising funds with which to erect a combined electric light, power and ice plant for said municipality, for the purpose of "supplying said city and the inhabitants thereof with adequate light, power and ice."

In the trial court the case turned upon the proper construction of chapter 31, Laws of 1921, which authorizes a municipal corporation to engage in any business for which it may issue a franchise to another, and also authorizes such a corporation to issue bonds for the acquisition and maintenance of any such business. The learned trial court held that a municipality had not the right to issue a franchise to another to construct and operate an ice plant, defining franchise

as "a right which cannot be exercised without the express permission of the sovereign power." Thompson on Municipal Corporations, 2d ed., § 2860. Not being authorized by law to issue a franchise for the construction and operation of an ice plant, the municipality, therefore, was not authorized, in the opinion of the trial judge, to issue its bonds for the acquisition of such business. The injunction was issued.

Appellant now urges in support of his appeal that chapter 31, Laws of 1921, upon the terms of which the decision of the trial court was based, must be construed in effect to have been amended by the prior adoption of section 34, article 2, Constitution of Arizona, which amendment authorizes the municipal corporations of the state to engage in industrial pursuits.

Counsel for appellant urges that said chapter 31, when considered in connection with the said amendment to the Constitution, should be held to read as follows:

"Every municipal corporation within this state shall have the right to engage in any industrial pursuit; and every such municipal corporation shall have the right and power to purchase, acquire, own and maintain, within or without the corporate limits of such municipal corporation, any such industrial pursuits; . . . and for any and all such purposes in order to carry out the same, such municipal corporation shall have the power to issue and sell bonds."

What is the proper construction to be given said chapter 31 is therefore an important question in the case. However, for convenience, we shall leave now the discussion of this question, returning to it later on in the course of this opinion.

On behalf of appellee, it is urged in this court that the power of municipal corporations to levy taxes is limited by section 1 of article 9, Constitution of Arizona, to public purposes; that an industrial pursuit,

such as an ice plant from which to supply the inhabitants of the city with ice, is not a public purpose; that the issue of bonds for such a purpose would later entail the levy of taxes for the payment of the principal and interest on such bonds, which taxes would in turn not be for a public purpose. Therefore appellee contends the judgment of the trial court enjoining the issue of such bonds should be affirmed.

What is, and what is not, a public purpose? It is fundamental that taxes may not be levied for private purposes. It has been well said:

"To lay with one hand the power of the government on the property of the citizen, and with the other to bestow it upon favored individuals to aid private enterprises and build up private fortunes, is none the less a robbery because it is done under the forms of law and is called taxation." *Loan Assn.* v. *Topeka,* 20 Wall. 655, 22 L. Ed. 455.

"Public purpose" is a phrase perhaps incapable of definition, and better elucidated by examples. The maintenance of an adequate police department for the keeping of order and the enforcement of the law; the construction of public buildings for the housing of government officers while performing their public duties, without which the business of government would be very inconveniently done; the provision for a system of public education so that the coming generation may be adequately prepared for the performance of the functions of government; opening, maintaining and paving a system of public streets, there being no corporation other than the government at all adequate for the performance of this duty; providing a system for the disposal of sewage, thus protecting the public health—all these are recognized clearly as governmental or public purposes. Other acts will be clearly recognized as not belonging to this category. Bonds issued in payment of land pur-

chased to aid in a private enterprise in holding annual fairs are not for public purposes (*Eufaula* v. *McNab,* 67 Ala. 588, 42 Am. Rep. 118); nor those issued as a donation in assisting a company to embark in the manufacture of linen fabrics *(Bissell* v. *Kankakee,* 64 Ill. 249, 21 Am. Rep. 554); nor those issued to relieve individuals whose homes had been destroyed by an extensive fire (*Coates v. Campbell,* 37 Minn. 498, 35 N. W. 366).

Other acts are of such a mixed or doubtful nature as to fall not clearly in one or the other of these categories. It is clearly within the limits of a governmental or public purpose to protect the public health, and one of the agencies most conducive to a high standard of public health is a pure and abundant water supply. It is true that all municipalities make a charge to the householder for the use of water from the public system, or in certain cases for furnishing water to manufacturing concerns, perhaps in immense quantities, for generating steam, or other industrial uses, and to that extent they may be said to be in the business of selling water for a profit. But this element has not in recent years hindered any court from holding that a city in establishing or maintaining a public water system might raise money for that purpose by taxation, and that this was a public purpose. *Opinion of the Justices,* 150 Mass. 592, 8 L. R. A. 487, 24 N. E. 1084. So the proper lighting of public highways and streets is held to be a valid exercise of the police power, having for its purpose the protection of the lives and property of the people of the community, a governmental purpose. Properly lighted streets and public places give a certain degree of immunity from attack by thieves, robbers or burglars at night, and also make them safer for their proper use. But in late years such lighting systems when established have been, with the sanction of the courts,

used for the purpose not only of lighting the streets and public buildings, but also in supplying for a profit gas or current to the inhabitants of the city for the lighting of their private residences and places of business, and for power to operate elevators and machinery. *Jacksonville Electric Light Co.* v. *Jacksonville,* 36 Fla. 229, 51 Am. St. Rep. 24, 30 L. R. A. 540, 18 South. 677. A toll-charging canal might gather to itself wide-spreading waters, and thus, in addition to furnishing transportation, promote the public health. The latter purpose would be held a public purpose. Toll-charging is a matter of profit; but the Erie Canal, constructed by the state of New York, is too venerable an example for the courts to pronounce such a canal not a public purpose, although it has been doubted that it is a governmental function to supply the commodity of transportation. Abbott's Public Securities, § 107, p. 224. These examples will suffice to show how mixed a question it often is to determine whether a given enterprise falls strictly within the governmental or public powers, or lies in the opposite field of proprietary effort.

It should be noted that the existence of an element of business for profit is not sufficient to determine whether the proposed activity is for a public purpose or not.

"The true test is that which requires that the work should be essentially public, and for the general good of all the inhabitants of the city. It must not be undertaken merely for gain or for private objects. Gain or loss may incidentally follow, but the purpose must be primarily to satisfy the need, or contribute to the convenience, of the people of the city at large. Within that sphere of action, novelty should impose no veto. Should some inventive genius by and by create a system for supplying us with pure air, will the representatives of the people be powerless to utilize it in the great cities of the state, however ex-

treme the want and dangerous the delay? Will it then be said that pure air is not as important as pure water and clear light? We apprehend not." *Sun Printing Assn.* v. *New York,* 40 N. Y. Supp. 607, 8 App. Div. 230, affirmed in 152 N. Y. 257, 37 L. R. A. 788, 46 N. E. 499.

In view of these general considerations is the manufacture and sale of ice by a city to its inhabitants a public purpose? In approaching this question, we must bear in mind the fact that many parts of the state of Arizona enjoy the advantages—and suffer the disadvantages—of a climate almost tropical. Would, for example, the government of the Canal Zone, Panama, be restrained from manufacturing and selling ice to the inhabitants on the ground that this was not for a public purpose? A supply of ice for the refrigeration of meat, milk, vegetables and other foods, and the protection of its purity for use in drinking water from the invasion of numerous tropical infections, might be held absolutely essential to the very existence of the Canal Zone government; without such a supply and such a protection every last agent of that government might be compelled to flee the country. Is the preservation of public administration and control a public purpose?

While climatic conditions in the warmer parts of Arizona are not so severe as at Panama, yet they are severe. The country is a desert country, and water is to be found in sufficient quantities for a city water supply only in infrequent spots. The water must be stored in large reservoirs and conducted in pipes for long distances over rocks and sands, heated to a high degree by the desert sun. While the water when drawn from the pipes of the city water supply under such conditions will preserve life, it does not afford anything but a very unpalatable drink. The Supreme Court of Maine, in deciding that a city might, in pur-

suit of a public purpose, establish a wood and coal yard for the sale of fuel to its inhabitants, with which it was difficult for the citizens to provide themselves, due to the existence of monopolistic combinations, makes this remark:

"It requires no argument to prove that coal is as conducive to the health, comfort, and convenience of the inhabitants of this northern latitude as is ice to that of the inhabitants of Georgia."

And we desire to reverse the argument and say that, if heat is necessary to the health, comfort and convenience of the inhabitants of Maine, ice is no less so to the inhabitants of Arizona. See *Laughlin* v. *Portland*, 111 Me. 486, Ann. Cas. 1916C 734, 51 L. R. A. (N. S.) 1143, 90 Atl. 318. It is necessary for the comfortable living of every person.

In considering what is properly a public purpose, we should not be controlled to too great an extent by decisions of courts in climates far distant from ours. Further, we should not be to too great an extent controlled by decisions which come from a remote time, and therefore may be out of tune with modern conditions. The question of what is a public purpose is a changing question, changing to suit industrial inventions and developments and to meet new social conditions. Law is not a fixed and rigid system, but develops, a living thing, as the industrial and social elements which form it make their impelling growth. *Laughlin* v. *Portland*, above, 492 (90 Atl. 318); 19 R. C. L. "Municipal Corporations," par. 29, p. 722. And along this line we are reminded that the state of industry and inventions has so developed that this court must be discreet, or it may be involved in a practical absurdity. The very bond issue that is here under discussion is partly for the erection of an electric lighting system for the city, the purpose of which

is also to sell electric current to the inhabitants of the city. Now, it is well known in these modern days that electric current is used, not only for lighting, but also for many household and industrial power purposes, and for domestic heating and cooking. An invention recently put upon the market also uses the current for cooling the refrigerator and manufacturing ice in the household. The legality of such an electric system, the use for such purposes, is admitted in this case, and of course is well supported by judicial authority. Now, if the city of Tombstone may furnish ice and refrigeration to its inhabitants for a price by means of an electric system, why may it not do so by the means of the sale of ice to be hauled and delivered in the more primitive way? If the delivering of electric current for purposes of refrigeration and ice is a public purpose and necessary for the convenience, comfort and health of the citizens of Tombstone, why is not ice just as necessary? It is true that electric refrigerators and ice machines for the home could only be installed by those citizens of Tombstone who are more fortunate, while the poorer citizens would thus be deprived of what in our climate is a necessity. Such a decision might be a fortification of the saying that conservatism is never on the side of the unfortunate. Ruling Case Law, volume 19, at page 721, has this to say concerning what are public purposes:

"Municipal corporations are not limited to provide for the material necessities of their citizens. Under legislative authority they may minister to their comfort, health, pleasure, or education. They are not limited to policing a city, to paving the streets, to providing it with light, water, sewers, docks, and markets. The power of cities and towns to maintain institutions which educate and instruct as well as please and amuse their inhabitants, such as libraries and botanical and zoological gardens is unquestioned. So also the public funds may be expended in providing

an exhibit at a fair or exposition. The reasonable use of public money for memorial halls, monuments, statues, gates, or archways, celebrations, publication of town histories, parks, roads leading to points of fine natural scenery, decorations upon public buildings or other public ornaments or embellishments designed merely to promote the general welfare, either by providing for fresh air or recreation, or by educating the public taste, or by inspiring sentiments of patriotism or of respect for the memory of worthy individuals has received such general sanction that there can be no doubt that municipal corporations may be constitutionally authorized to expend money raised by taxation for such purposes. The trend of authority in more recent years has been in the direction of permitting municipalities a wider range in undertaking to promote the public welfare or enjoyment. Thus the appropriation of money for public concerts has been held to be proper; so too the erection of an auditorium has been regarded as properly falling within the purposes for which a municipal corporation may provide. Generally speaking, anything calculated to promote the education, the recreation, or the pleasure of the public is to be included within the legitimate domain of public purposes, and on this ground it has even been held that authority to erect and conduct an opera house may be conferred upon a municipal corporation.''

If a city may spend the public revenues upon public ornaments and embellishments, upon concerts or opera houses, for the mere recreation or pleasure of the public, why may it not spend a portion of those revenues that its inhabitants may have such a necessity as ice in a torrid climate? Justice HOLMES, now of the Supreme Court of the United States, formerly of the Massachusetts Supreme Court, once said:

''I am of opinion that when money is taken to enable a public body to offer to the public without discrimination an article of general necessity, the pur-

pose is no less public when that article is wood or coal than when it is water, or gas, or electricity, or education, to say nothing of cases like the support of paupers or the taking of land for railroads or public markets." *Opinion of the Justices,* 155 Mass. 598, 15 L. R. A. 809, 30 N. E. 1142.

Under a constitutional provision limiting taxation to public purposes similar to that contained in the Constitution of Arizona, the Supreme Court of Missouri recently decided that the construction and operation of a municipal ice plant was not a public purpose such as would warrant the expenditure of public money. *State ex rel. Kansas City v. Orear,* 277 Mo. 303, 210 S. W. 392. The contrary view has been expressed by the Supreme Court of Georgia in *Holton v. City of Camilla,* 134 Ga. 560, 20 Ann. Cas. 199, 31 L. R. A. (N. S.) 116, 68 S. E. 472, confirmed in *Saunders v. Mayor & Council of Town of Arlington,* 147 Ga. 581, Ann. Cas. 1918D 907, 94 S. E. 1022. We are constrained to a view in accordance with that of the Supreme Court of Georgia as being more in accordance with the spirit of modern times, industrial conditions of the day, and the climatic conditions of Arizona. This being our view, we do not decide in this case whether that part of section 1 of article 9 of the Arizona Constitution, to the effect that taxes shall be levied and collected for public purposes only must be held to have been amended by the later adoption of section 34 of article 2 of the Constitution, giving the state and municipalities thereof the right to engage in industrial pursuits, since we hold that a municipal ice plant for the sale of ice to the inhabitants of the municipality is a public purpose. It is not necessary, nor would it be proper to decide in this case the broader constitutional question.

We return now to the question of what is the proper construction to be given chapter 31, Session Laws of

1921. The act first appears as a part of chapter 11, Laws of First Special Session of 1912, approved June 8, 1912. It appears to have been properly based upon section 5, article 13, of the Arizona Constitution, authorizing a municipality to engage in any business or enterprise for which it might grant a franchise. Some five months after the approval of said chapter 11, the Constitution of Arizona was amended by the adoption of section 34, article 2, allowing municipalities to engage in industrial pursuits. It appears again, rewritten and modified in particulars, as paragraph 2035, Civil Code of 1913. This paragraph was again amended in details, appearing as said chapter 31, Laws of 1921, still, however, declaring, solemnly forgetful of the constitutional amendment adopted nearly nine years before, that every municipality shall have the right to engage in any business or enterprise for which it might grant a franchise. What is the proper construction to be given this act?

Thomas Jefferson warned his fellow-citizens "to avoid sharp practice in interpreting the Constitution. Instead of trying what meaning may be squeezed out of the text or invented against it, conform to the probable one in which it was passed"—a principle which applies also to the interpretation of a statute as well. The object of all interpretation and construction of statutes is to ascertain the meaning and intention of the legislature. Black on Interpretation of Laws, p. 35; *United States* v. *Hartwell,* 6 Wall. 385, 18 L. Ed. 830. Every amendment or rewriting of said chapter 11, down to and including its final form in said chapter 31, seems to have been based on error, on a forgetting that the fundamental law had been changed to allow municipalities to engage in industrial pursuits, not only those pursuits for which the municipality might grant a franchise. Now it was

never necessary for the legislature to declare the forms of business in which municipalities might engage. This was already settled by the Constitution which the legislature could in no way modify. So the real purpose of the act was something else. It appears upon inspection that the legislative purpose was to authorize municipal bonds to be issued and sold by certain classes of municipalities under certain conditions. The fact that the people added certain classes of business to the constitutional powers of municipalities should not, it seems to us, require this court to find that the legislature in this act intended the power to issue bonds to be extended also to the new classes of business, which classes the very error of the legislature shows not to have been in the mind, and therefore not within the intent, of the legislature. The power of a municipality to engage in a business is a widely different matter from its power to issue negotiable instruments or bonds. If we should follow appellant's argument and adopt the construction for which he contends, we think the members of the legislature might justly exclaim, paraphrasing the well-known scriptural text, "Behold, what the Supreme Court hath wrought." We have in mind the rule that an amendment of the Constitution must be held to amend the existing statute law to agree with such amendment; but the present case does not call for the application of this principle.

We now pass to a broader question. Has the City of Tombstone been authorized by law to issue and sell the bonds in this case? At the state of this inquiry we note that chapter 2 of title 52, Civil Code of 1913, being paragraphs 5266 to 5285, sets forth a method whereby a municipal corporation may issue its bonds, whenever it is attempted to increase the aggregate amount of its indebtedness to exceed more than four

per centum of the value of the taxable property in such municipality. Paragraph 5266. The pleadings in this case show that the bonds herein proposed to be issued would have increased the debt of Tombstone to an aggregate above said four per centum, and that the issue and sale of the proposed bonds in this action was proposed to be made and the election therefor was held in accordance with the terms of this chapter. It is especially to be noted that paragraph 5285 thereof contains the following important proviso:

"Provided, that bonds may be issued under the provisions of this chapter, for the construction and reconstruction of roads, bridges and highways; for the construction of public buildings, *and for any other lawful or necessary purpose. The enumeration of the above-mentioned purposes, shall not be deemed as restrictive of the right to issue bonds for other purposes, but rather in furtherance thereof.*"

In order to get all of the constitutional and statute laws affecting the question before us, they may be roughly abstracted thus, in the order of their enactment:

(1) Municipalities may engage in any business or enterprise for which they may grant a franchise. Section 5 of article 13, Constitution of Arizona.

(2) Municipalities of more than 3,500 population may acquire, own and maintain any such business, and may issue and sell bonds for such purposes. Chapter 11, First Special Session 1912.

(3) Every municipality may engage in industrial pursuits. Amendment, section 34 of article 2, Constitution of Arizona.

(4) Bonds may be issued by any municipality for the construction of roads, etc., and for any other lawful or necessary purpose. Chapter 20, Third Special Session 1913 (paragraph 5285).

(5) Item No. 2 reaffirmed and modified in some details.   Chapter 90, Third Special Session 1913 (paragraph 2035).

(6) Privileges of item No. 2 extended to every municipality.   Chapter 31, Acts 1921.

Item 6 or chapter 31, aforesaid, expressly repeals items 2 and 5 of the abstract given above.   Items 1 and 3 relate to the businesses or industries in which a municipality may engage; they do not affect, except indirectly, the power of municipalities to issue bonds; this matter is covered by items 4 and 6.   Does item 6 repeal item 4?   We think not.   The latter act makes no reference to the former.   Repeals by implication are not favored.   The new law is evidently not intended to supersede the prior act, and to comprise in itself the sole and complete system of legislation upon the subject of bond issues; the field of the earlier act is much broader, covering bond issues by counties and school districts as well as by municipalities, together with minute directions, the only ones in our statutes as to municipalities, governing bond elections, the petitioning therefor, limit of indebtedness, order for election, notice thereof, holding of election, canvassing the vote, with full directions as to form and terms of the bonds and coupons, and as to the sale, issue, and payment thereof.   The provisions of the two acts must have been intended to remain equally in force.   Black on Interpretation of Laws, § 57, p. 112.   Indeed, the latter act appears to have been passed, not to take away rights already existing, but to extend them, and to add to the security of proposed bond issues by timid municipalities.

The charter of the City of Tombstone authorizes the city to provide by taxation for "the protection, benefit and convenience of said city, and its inhabitants."   Subdivision 9, art. 2, § 1, No. 39, Acts 1881.

We have held that a municipal ice plant for the sale of ice to the inhabitants of the municipality is a public purpose. It is a business within the power of the City of Tombstone by its charter and by the Constitution of Arizona. It is therefore a lawful purpose, and a bond issue for such purpose is authorized by paragraph 5285, above cited.

Therefore it is ordered, adjudged and decreed that the judgment entered herein be, and the same is hereby, reversed, and the cause remanded to the superior court of Cochise county, with directions to dismiss the complaint.

McALISTER, C. J., and ROSS, J., concur.

NOTE.—Judge LOCKWOOD having been disqualified, Honorable FRED L. INGRAHAM, Judge of the Superior Court of Yuma County, was called to sit in his stead.