THOMPSON v. HARRIS, Warden.
DEMMICK v. SAME.

Nos. 6655, 6656. Decided December 31, 1943. (144 P. 2d 761.)

*Dorothea Merrill Dryer,* of Salt Lake City, for plaintiff Thompson.

*Ray S. McCarty,* of Salt Lake City, for plaintiff Demmick.

*Brigham E. Roberts,* Dist. Atty., of Salt Lake City, and *Grover A. Giles,* Atty. Gen., for defendant.

WOLFE, Chief Justice.

Plaintiffs, Grover Thompson and Carl Rolland Demmick, each separately petitioned this court for a writ of habeas corpus. In each petition it was alleged that the petitioner was being illegally restrained by the defendant, John E. Harris, Warden of the Utah State Penitentiary. The writs issued ordering the warden to appear before this court with the prisoners at a time specified. The warden filed his return to each writ but by stipulation it was agreed that it would not be necessary for the warden to bring the petitioners before the court.

For the most part these cases involve identical points of law. They were consolidated for presentation and argument. What is said herein applies to both cases unless otherwise indicated.

Since the writs were made returnable to this court, no evidence was or could be taken at the hearing upon the return. The allegations in the return must, therefore, be presumed to be true. *Jensen* v. *Sevy*, 103 Utah 220, 134 P. 2d 1081. In each return the warden alleged that he was holding the petitioner by virtue of a commitment issued by the District Court of Salt Lake County. The commitments attached to the returns appear to be in regular form. One commitment shows that pettioner Thompson was tried before a jury and convicted upon a charge of robbery and being an habitual criminal, and that on January 30, 1942, he was sentenced and committed to the State Prison for a term of not less than 15 years. The other commitment shows that petitioner Demmick was found guiltly of the crime of burglary in the second degree and being an habitual criminal and sentenced to an indeterminate term of "not less than 15 years nor more than life" in the State Penitentiary.

The petitioners take the position that the returns themselves show that the District Court acted in excess of its jurisdiction in imposing sentences of not less than 15 years. This contention is based on the fact that the commitments

filed with the returns show that each of the petitioners was sentenced as an habitual criminal under the Habitual Criminal Act, 103-1-18, U. C. A. 1943, which Act the petitioners contend had been repealed by the enactment of the indeterminate sentence law, Laws of Utah, 1913, Chap. 100, p. 192. We first consider this contention.

The Habitual Criminal Act was enacted in 1896, Laws of Utah, 1896, p. 262. It provided:

"Whoever has been previously twice convicted of crime, sentenced and committed to prison, in this or any other State, for terms of not less than three years each, shall upon conviction of a felony committed in this State after the passage of this act, other than murder in the first or second degree, be deemed to be an habitual criminal, and shall be punished by imprisonment in the State Prison for not less than fifteen years; * * *."

The statute was designed to fit into a system of punishment under which a person convicted of a crime was sentenced to a definite term, between fixed statutory limits. While a few crimes such as murder had minimum sentences of over three years, most felonies carried minimum penalties of one year and maximums of over three. Upon a conviction for any of the crimes carrying a minimum of one year and a maximum of over three years, the trial judge would, after weighing the surrounding circumstances, impose a sentence for a definite term. If that sentence and the subsequent commitment were for a period of three years or over, the conviction could be subsequently used as a basis for an habitual criminal charge; if the sentence was for a term of less than three years it could not be so used. See the discussion in this regard in *State* v. *Walsh,* 106 Utah 22, 144 P. 757.

In 1913, Laws of Utah 1913, Chap. 100, p. 192, the Indeterminate Sentence Law was enacted. It took from the trial judge the power to impose a definite sentence and in its place required him to impose an indeterminate sentence for a period of time not less than the minimum nor more than the maximum prescribed by law for that particular

crime. The court was to advise the Board of Pardons as to the facts surrounding the conviction. These facts, together with the recommendation from the trial judge as to how long, in his opinion, the prisoner should be imprisoned, were to be forwarded to the Board of Pardons within 30 days from the date when sentence was imposed. The Board of Pardons was in all cases to decide the exact length of time the prisoner should serve in prison.

The petitioners contend that the indeterminate sentence law outlined a social policy with respect to the duration of sentences which was a complete substitute for the habitual criminal law and the social policy it represented. In furtherance of this contention, it is urged that: "If the legislature intended to give this board discretion respecting the duration of sentence to the Board of Pardons, it impliedly withdrew its own previous determination of the sentence in the type of case covered by the habitual criminal law. Such an implication is supported by the fact that the legislature gave such broad discretion to the Board of Pardons as to render inoperative every legislative determination of a 'minimum' sentence. The habitual criminal law is a minimum sentence law and is accordingly impliedly repealed." In this regard it may be noted that the Board of Pardons in passing upon an application for a prisoner's release can, in addition to the prisoner's conduct in prison and the facts surrounding the commission of the crime for which he was imprisoned, take into account information concerning the prisoner's prior life, his family, friends, and previous conduct. Any previous criminal record would of course be obtainable from proper sources. Thus, as petitioners urge, this procedure could have been designed to supersede the habitual criminal law. But it does not appear that such was the intent of the legislature.

Admittedly the indeterminate sentence law did not expressly repeal the Habitual Criminal Act, and repeals by implication are not favored. *City of Tombstone* v. *Macia*,

30 Ariz. 218, 245 P. 677, 46 A. L. R. 828; *Southern Pac. Co.* v. *Railroad Comm.,* 13 Cal. 2d 89, 87 P. 2d 1055; *People* v. *Downen,* 106 Colo. 557, 108 P. 2d 224; *State* v. *Schnell,* 107 Mont. 579, 88 P. 2d 19, 121 A. L. R. 1082; *Dondero* v. *Turrillas,* 59 Nev. 374, 94 P. 2d 276; *Guiterrez* v. *Gober,* 43 N. M. 146, 87 P. 2d 437; *State* v. *White,* 170 Okl. 126, 39 P. 2d 69; *Cabell* v. *City of Portland,* 153 Or. 528, 57 P. 2d 1292; *Seattle First Nat. Bank* v. *Spokane Co.,* 196 Wash. 419, 83 P. 2d 359; *Brugneaux* v. *Dankowski,* 51 Wyo. 103, 63 P. 2d 800. It is only where there is a manifest inconsistency or conflict between a later and an earlier law that a repeal by implication will be held to have occurred. *People* v. *Downen,* supra; *State* v. *Schnell,* supra; *Nelden* v. *Clark,* 20 Utah, 382, 59 P. 524, 77 Am. St. Rep. 917.

The Habitual Criminal Act and the Indeterminate Sentence Law are not irreconcilable. Where a sentence is imposed for an indeterminate period between a minimum and maximum the prisoner could not in any event be required to serve a term longer than the maximum. He is entitled to an absolute release when he has served the maximum time.

There is nothing in the Habitual Criminal Act which could be held to be in conflict or inconsistent with this. A sentence under the Habitual Criminal Act is an indeterminate sentence with a minimum of not less than 15 years and maximum of life. In effect this permitted the Board of Pardons to keep a person found to be an habitual criminal in prison for the rest of his natural life.

True the original procedure of having the trial judge who heard the evidence determine whether or not the criminal conduct was of such a nature as to justify the imposition of a sentence of "not less than three years" was repealed by the indeterminate sentence law. But repeal of part does not require a conclusion that the entire act has been repealed. *Nelden* v. *Clark,* 20 Utah 382, 59 P. 524, 77 Am. St. Rep. 917. One effect of the enactment of the indeterminate sentence law was that thereafter those crimes carrying in-

determinate sentences with a minimum of less than three years could no longer be used as a basis for an habitual criminal charge. *State* v. *Walsh,* supra. There is, however, nothing to indicate that the legislature intended completely to abolish the Habitual Criminal Act. Those crimes which were of such a nature that the legislature required the imposition of a sentence for an indefinite term with a minimum of three years or more could still be used as the basis for a charge under the Habitual Criminal Act. If there had been two previous convictions for such crimes, then upon a subsequent conviction for *any* felony, the court was to impose a heavier penalty of not less than 15 years. This gave to the Board of Pardons a broad discretion. It could hold the prisoner, who had been proved to be an habitual criminal, in prison for the remainder of his natural life; or it could pardon him immediately. But the sentence of not less than 15 years is a statement of policy that the prisoner be required to serve at least that long. This is perfectly consistent with the indeterminate sentence law.

Further, there are various factors which indicate that the legislature subsequent to the enactment of the indeterminate sentence law considered the Habitual Criminal Act to be in force. Both the Habitual Criminal Act and the Indeterminate Sentence Law appear in the 1933 Revised Statutes of Utah. In *State Tax Commission* v. *Backman,* 88 Utah 424, 55 P. 2d 171, 175, we held that "the 1933 revision is not a mere compilation by the code commissioners but is an entirely new enactment by the Legislature. The enactment by the Legislature of the Revised Statutes gives force and effect to every provision therein the same as if single chapters had been enacted making changes and amendments." Thus both acts were re-enacted in 1933. Then again in 1935 (Laws of 1935, Chap. 118, 105-21-47) the legislature in setting out example forms which might be used in an information charging particular crimes, included a form for a charge under

the Habitual Criminal Act. We must conclude that the Habitual Criminal Act has not been repealed.

The petitioners next contend that the informations in which petitioners were charged with being habitual criminals were defective in that each of said informations affirmatively showed that such charge was based upon previous convictions and sentences for an indefinite term with a minimum of only one year. This contention is based upon the theory that an indeterminate sentence of "not less than one nor more than ten years" is not a sentence of "not less than three years" within the meaning of the Habitual Criminal Act. This point appears to be well taken. See *State* v. *Walsh,* supra. But it is doubtful whether this defect can be reached by a writ of habeas corpus.

The claimed error of the court in permitting the habitual criminal charge to be based on these allegedly defective informations is not a jurisdictional error. In view of our holding that the Habitual Criminal Act had not been repealed, it cannot successfully be urged that the trial court did not have jurisdiction to construe said act. If the court erroneously concluded that an indeterminate sentence of "not less than one nor more than ten years" was a sentence and commitment for a term of "not less than three years" within the meaning of the Habitual Criminal Act, this error would not deprive the court of jurisdiction. On habeas corpus this court is generally limited to the question of whether the committing court had jurisdiction to try and commit. See *Bleon* v. *Emery,* 60 Utah 582, 209 P. 627. It is clear that the failure of the informations to state a public offense cannot generally be reached by habeas corpus. See *Areson* v. *Pincock,* 62 Utah 527, 220 P. 503; *Bruce* v. *East,* 43 Utah 327, 134 P. 1175. A good statement of the rule in this regard can be found in Ex parte *Turner,* 92 Vt. 210, 102 A. 943, 946, in which the court stated:

"The relator insists that the complaint on which he was convicted is wholly insufficient to charge an offense under No. 101, Acts of

1915. However, the question is not as to the sufficiency of the complaint as a matter of pleading, but whether it is void in that it describes no offense. The inquiry in such case is not whether the complaint contains such specific allegations as would make it good on demurrer or motion in arrest, but whether it describes a class of offenses of which the court has jurisdiction and alleges the respondent to be guilty. In re Coy, 127 U. S. 731, 8 S. Ct. 1263, 32 L. Ed. 274. If there is a manifest want of criminality in the matter charged, such as in effect to render the proceedings void, doubtless relief could be granted on the writ of habeas corpus. Note 26 Am. Dec. 48. But where the complaint, though inartificially drawn, shows an evident attempt to state the essential facts which constitute the crime sought to be charged, a defect in statement will not warrant a discharge. To hold otherwise would be to substitute the writ for the regular proceedings in error and would result in intolerable interference with the ordinary process of criminal prosecutions. 12 R. C. L. 1202."

This same rule was set forth in *Atwood* v. *Cox*, 88 Utah 437, 55 P. 2d 377, 381. We there stated:

"Where the law gives the power to entertain a cause, and the pleadings state facts sufficient to show that such a cause is intended or attempted to be brought before the court, the court has jurisdiction to entertain or proceed with it even though the pleading does not state facts sufficient to constitute a cause of action or a crime, as the case may be. It takes a pleading to invoke the jurisdiction of the court, but, if the pleading shows that the cause or controversy relates to a subject-matter over which the court has jurisdiction, then the jurisdiction of the court is effective for the purpose of proceeding with the cause or controversy."

See also Exparte *Leach*, 215 Cal. 536, 12 P. 2d 3, appeal dismissed *Leach* v. *People of State of California*, 287 U. S. 579, 53 S. Ct. 313, 77 L. Ed. 508; *Cronin* v. *Ennis*, 8 Cir., 11 F. 2d 237; *Wilson* v. *Haynes*, 218 Idaho 1370, 256 N. W. 678, certiorari denied 55 S. Ct. 646, 295 U. S. 731, 79 L. Ed. 1680; *Sander* v. *Johnston*, 9 Cir., 11 F. 2d 509.

It will be noted that in discussing this contention we have assumed that the informations were properly before us. Technically copies of them may not be considered for they were merely annexed to the petitions for the writs and the "averments of the petition although not denied or controverted by the return, cannot be considered

as admitted." *Jensen* v. *Sevy*, supra [134 P. 2d 1084].
There is, therefore, nothing from which we could properly
determine whether or not the informations were defective
in this regard.

Another matter which the petitioners seek to have re-
viewed by writs of habeas corpus involves a question of
procedure under an habitual criminal charge. It is
their contention that the court had no jurisdiction
to determine their status as habitual criminals until
*after* they had been tried and convicted for the substantive
offense. They urge that to submit to the jury simultaneously
evidence relating both to the substantive crime for which
they were being tried and evidence relating to their previ-
ous convictions, deprived them of a fair trial such as to
constitue a lack of due process of law.

It is often stated that the scope of review on habeas
corpus is limited to the examination of the jurisdiction of the
court whose judgment of conviction is questioned. We
must never lose sight, however, of the fact that habeas
corpus is the precious safeguard of personal liberty. That
jurisdictional questions only are reachable by the writ is
not such an inflexible rule as cannot yield to exceptonal
circumstances. It may be better to say that the rule which
apparently limits the scope of the writ to jurisdictional
questions is not a rule of limitation, but a rule defining the
appropriate spheres in which the power should be exercised.
Thus it has been held that the writ will lie if the petitioner
has been deprived of one of his constitutional rights such
as due process of law. See *Johnson* v. *Zerbst,* 304 U. S.
458, 58 S. Ct. 1019, 82 L. Ed. 1461, 146 A. L. R. 357; *Bowen*
v. *Johnston,* 306 U. S. 19, 59 S. Ct. 442, 83 L. Ed. 455.

We do not, however, consider this procedural error, if
error it were, to be either a jurisdictional error or an error
which would deprive the petitioner of any constitutional
rights. We know of no constitutional provision which as-
sures the defendant that testimony of prior convictions will
not be used as evidence in seeking a conviction for a subse-

quent criminal charge. This is substantially a rule of evidence based on considerations of justice. According to Wigmore the rule of exclusion of such evidence was originally invoked by the courts themselves. He states in a note to Section 194 in Wigmore on Evidence that:

"It is clear that before 1670-1680 the accused's prior record of misconduct could be considered: 1669, Hawkins' Trial, 6 How. St. Tr. 921, 935, 949 (larceny; details of a larceny from another person at another time, allowed to be given; L. C. B. Hale: 'This, if true, would render the prisoner now at the bar obnoxious to any jury') ; 1684 Hampden's Trial, quoted supra (the judge, in excluding such evidence invokes a 'case lately adjudged in this court'). * * *."

Of this evidence of prior convictions Wigmore states (Sec. 194) :

"It is objectionable, not because it has no appreciable probative value, but because it has too much. The natural and inevitable tendency of the tribunal—whether judge or jury—is to give excessive weight to the vicious record of crime thus exhibited, and either to allow it to bear too strongly on the present charge, or to take the proof of it as justifying a condemnation irrespective of guilt of the present charge. * * *

"The reasons thus marshalled in various forms are reducible to three: (1) The over-strong tendency to believe the defendant guilty of the charge merely because he is a likely person to do such acts; (2) The tendency to condemn, not because he is believed guilty of the present charge, but because he has escaped unpunished from other offenses; both of these represent the principle of Undue Prejudice (post Sec. 1904) ; (3) The injustice of attacking one necessarily unprepared to demonstrate that the attacking evidence is fabricated; this represents the principle of Unfair Surprise (post, Sec. 1849)."

Nowhere do we find any authority to the effect that the defendant has a constitutional right to have excluded the evidence of previous crimes. The erroneous admission of such evidence would not constitute a lack of due process. Nor does it go to the question of the court's jurisdiction to proceed. It is merely error and must be raised by appeal. Were it otherwise there would never be an end to criminal

litigation. We must hold that this claimed error is not reachable by this writ of habeas corpus.

This disposes of all issues raised by the petitioner, Grover Thompson. In addition to the above, petitioner Demmick contends that the commitment made and entered on January 4, 1943, wherein he was committed to ▉ prison was illegal and void. Demmick urges that when the court passed sentence in November of 1942, it granted him a conditional stay of execution until January 4th, 1943. On said latter date the court ordered Demmick committed to the prison.

Demmick contends that the record shows that he was given a parole—that his sentence had been suspended until January 4th with an assurance that he would get another stay if he complied with certain conditions—but that the court on January 4, 1943, terminated this stay order without cause and without giving him an opportunity to be heard. The state contends that this was merely a stay of execution to a day certain; that upon the date thus set, the commitment was issued as of course.

In *State* v. *Zolantakis,* 70 Utah 296, 259 P. 1044, 1047, 54 A. L. R. 1463, we held that

"a person who has a sentence suspended during good behavior, *without any limitation,* is entitled to a hearing upon the question of whether or not he has complied with the conditions imposed; that such hearing must be according to some well recognized and established rules of judicial procedure; * * *."

and that the accused has a right to be heard as to whether he has violated the conditions upon which the suspended sentence was based. (Italics added.)

If, as the petitioner contends, he was granted a conditional parole, which parole was terminated without an opportunity to be heard or without taking evidence as to whether the condition had been broken, he has been illegally committed. A writ of habeas corpus is a proper procedure to determine this question. Such was the procedure followed in Ex Parte *Lebarre,* 74 Okl. Cr. 156, 124 P. 2d 277.

Under the holding in *Jensen* v. *Sevy,* supra, the petition for the writ of habeas corpus would ordinarily drop out of the case as soon as the writ issues, it having served its purpose. The record showing what trans- at the time of the commitment of Demmick appears only as an exhibit attached to the petition for the writ. Technically under the Sevy case this record may not be before us. However, since these happenings are matters of record we could on our own motion have this record brought before us by the issuance of a writ of certiorari in aid of the writ of habeas corpus. The copy of the record attached to the petition for the writ is properly certified. Both parties have in their arguments on the merits treated the record as though it were here. Nothing could be gained by the issuance of a writ of certiorari to bring before us another certified copy of this same record. There is no question but what the copy attached to the petition is a correct copy. We shall, therefore, consider it as though it had been properly brought before us by the issuance of a writ of certiorari.

This record shows that the petitioner, Demmick, was sentenced to serve an indeterminate sentence of not less than fifteen years in the State Prison. The judge then stated: "However, I am going to give you a stay in that matter and place you with the Adult Board of Probation and Parole." After some discussion with counsel the court continued: "I am going to give you a stay until January 4, 1943." Demmick was then asked concerning his work and told that he must not drink. The court said "If I hear of your drinking at all, I will sign a commitment."

On January 4, 1943, the defendant was committed to the State Prison to serve the term previously imposed. The order of commitment stated:

"The within named defendant having previously been granted a stay of execution of sentence to this date, upon recommendation of the State Adult Parole and Probation Department and good cause appear-

ing therefor the Court orders the defendant committed pursuant to the judgment and sentence previously entered herein."

From the record before us we are unable to resolve our doubts concerning the true nature of this conditional stay order. It does not clearly come within the holding of the Zolantakis case. That case involved a suspension of a sentence during good behavior without any limitation as to time. The stay order here was for a definite length of time. It was not revoked—it expired. Upon its expiration the defendant was committed in accordance with the judgment and sentence previously imposed. The petitioner has failed to carry his burden of proving that he was unlawfully committed. The record does not establish that the court gave him a stay to a day certain with an implied promise that if he complied with the conditions imposed he would be granted a further stay.

On the other hand the wording of the order of commitment does not clearly support the position taken by the state. If this were merely a stay so that the prisoner could get his affairs in order, why does the court consider the order of the State Adult Parole and Probation Department? Why does it imply that it was necessary there be "good cause" for issuing the order of commitment when the record showed that the defendant had been previously committed and sentenced? The comments of the trial judge regarding the defendant's job, and admonition that the defendant must not drink, also indicate that this was more than a stay to a day certain. Perhaps had this issue been joined in a court which had the machinery for hearing evidence a more complete picture could have been given. The petitioner has not from the record before us shown that the commitment was unlawful within the principles laid down in the Zolantakis case. He has, however, succeeded in throwing considerable doubt concerning the validity of the commitment. In view of this we do not wish to foreclose the issuance of a future writ of habeas corpus to have this matter more fully de-

termined upon all the evidence. Upon this point, therefore the writ may be denied without prejudice.

From what has been said it necessarily follows that the writ of petitioner Thompson must be denied; the writ of petitioner Demmick denied without prejudice on the issue of the lawfulness of his commitment. Such is the order.

McDONOUGH, MOFFAT, and WADE, JJ., concur.

LARSON, Justice (concurring specially).

I concur, and desire to add two further matters that support the reasoning of the opinion. The holding that the Habitual Criminal Act was not repealed by implication by the Indeterminate Sentence Law, is further shown and fortified by the fact that the legislature of 1913, which enacted the indeterminate sentence law, also amended Title 57 of C. L. Utah 1907, which dealt with the Board of Pardons and the parole of prisoners. One section, 1686x18, dealing with paroles of prisoners generally was repealed and a new section enacted on that subject; but Section 1686x17, dealing with paroles, or permits to habitual criminals to be at liberty was not amended or repealed, and appears in C. L. U. 1917, as section 4334, and was carefully preserved in the statutes until the revision of 1933, when it was merged in the general section dealing with termination, commutation and parole of prisoners.

When the Indeterminate Sentence Law was enacted in 1913, the legislature provided that the court should sentence felons, except for murder or treason, to the state prison, which *"sentence* shall be without limit as to time." (Italics added.) But the law provided that *imprisonment* under such sentence should not exceed the maximum term provided by law for the offense. Chap. 100 Laws of Utah 1913. Also Sec. 9062, C. L. U. 1917. This in effect did away with the provisions in the statute referring to minimum period of imprisonment, and took out of the commitments any refer-

ence to maximum or minimum provisions. In 1919 (L. of U. 1919, Chap. 132) the legislature amended the section to provide that the sentence of the court should be "for a period of time not less than the minimum and not to exceed the maximum term provided by law for the particular crime." Thus it was provided that the commitment should show the minimum, as well as the maximum period set out in the penal code. I think the purpose of having a minimum period fixed in the commitment is to make that record itself show the nature of the offense and whether or not it was one that could form part of the basis required for the habitual criminal status. The habitual criminal section provides that

"whoever has been previously twice convicted of crime, sentenced and *committed* to prison * * * for *terms* of not less than three years each * * *." (Italics added.) U. C. A. 1943, 103-1-18.

The requisites to show the status of being an habitual criminal may then be proved and established by the *commitments* themselves. This seems to be further borne out by the provisions of Section 105-36-20 U. C. A. 1943, which section was enacted in its present form in 1919—L. of Utah 1919, page 353. It provides that the sentence and judgment shall be for a period of not less than the minimum nor more than the maximum. It then declares that it shall in effect be a sentence for the maximum, unless sooner terminated or commuted as provided by law; a power then and now lodged in the Board of Pardons. The section also provides that such sentence shall be construed and held to be a sentence for a *term* not less than the minmum. Since the Board of Pardons is granted specific authority to commute or terminate any sentence at any time from the day of commitment, the only purpose for which it should be construed and held to be a sentence for a term not less than the minimum would be to fix it as a term which could or could not be the basis for putting one in the status of being an habitual criminal.