PHŒBE REBECCA ELIZABETH ELWINA LINTON ET AL., APPELLEES, V. JOHN WHITTAKER COOPER ET AL., APPELLANTS.

FILED JANUARY 3, 1898.   No. 7646.

1. **Conveyances:** ACKNOWLEDGMENT. As between the parties an acknowledgment is not essential to the validity of a conveyance, unless the property be a homestead, or for the purpose of barring dower.

2. ———: ———: MARRIED WOMEN. A conveyance by a married woman of her separate property, not her homestead, is valid between the parties although not acknowledged.

3. **Evidence:** CONVEYANCES: ACKNOWLEDGMENT. A valid acknowledgment permits a conveyance to be received in evidence without further proof; but one not acknowledged may be received in evidence if its execution and delivery be otherwise proved.

4. **Husband and Wife:** MORTGAGES: CONSIDERATION. A married woman may pledge her separate estate to secure an indebtedness of her husband, but there must be a new consideration to sustain a mortgage to secure his antecedent debt.

5. ———: ———: ———. The making of further advances to the husband is a sufficient consideration to sustain a mortgage by the wife of her separate property to secure an antecedent debt. In such case the repayment of the subsequent advances does not discharge the mortgage.

6. Mortgages: Consideration: Evidence. Evidence examined, and *held* to conclusively show a delivery of the mortgage in suit, and a valid consideration therefor.

Appeal from the district court of Douglas county. Heard below before Ferguson, J. *Reversed.*

*Charles A. Goss* and *John L. Webster,* for appellants.

*John T. Cathers* and *William A. Redick,* contra.

Irvine, C.

This action was begun by Phœbe Rebecca Elizabeth Elwina Linton, and her husband, Adolphus Frederick Linton, against John Whittaker Cooper and others, composing the firm of Brown, Janson & Co., bankers in London, the object being to have declared void and canceled a mortgage to secure £10,000, purporting to have been made by the Lintons to Brown, Janson & Co. on fifty acres of land in Omaha, and also a deed purporting to convey certain other lands in Omaha, from the Lintons to Brown, Janson & Co. Brown, Janson & Co. answered, and by cross-petition sought the foreclosure of both instruments, alleging that the deed had been executed to secure the payment of a debt. On the trial the plaintiffs dismissed their petition, and the defendants abandoned all claim under the deed, so that the case proceeded as one by the defendants against the plaintiffs to foreclose the mortgage on the fifty acres. There was a finding for the plaintiffs, and a decree denying foreclosure and cancelling the mortgage. The defendants appeal.

Although both in the district court and in this the burden lies upon the defendants to establish the mortgage, the case can be best developed by stating the defenses relied on by the plaintiffs. These, while volu-

30

minously pleaded, may be briefly analyzed as follows:
(1) That the mortgage was never delivered; (2) that it
was not acknowledged according to law; (3) that, if given
at all, it was to secure only the past due indebtedness
of Mr. Linton, and covered the separate property of Mrs.
Linton, and was without consideration as to her.

Mrs. Linton is of American birth, the daughter of John
Borland Finlay.  Mr. Linton is a British subject; and
the two seem to reside in England, although their letters
in evidence are dated from London, Brighton, Ostend,
and Aix-la-Chappelle.  Mrs. Linton is the owner in her
own right of a considerable amount of property in and
about Omaha, including the fifty acres in controversy.
Mr. Linton had an account, in 1889, with the banking
firm of Brown, Janson & Co., the defendants.  On the
face of this account he was in October of that year in
debt to the bank in a large sum, apparently something
over £12,000.  An effort is made to show that at least
£10,000 of this debt was not really his, but that of Coates,
Son & Co.  We need not pay much attention to this
branch of the case.  In the light most favorable to Mr.
Linton it would seem to be a debt for which both he and
Coates, Son & Co. were liable, and the only question
would be which is the principal debtor and which the
surety.  There is in the record a judgment at law in Eng-
land from which it appears that Linton has been ad-
judicated the debtor of the bank to the amount claimed.
It is the theory of the defendants that the mortgage was
delivered October 21, 1889, to cover the existing indebt-
ness of Linton to the bank, together with future ad-
vances.  The mortgage is dated April 15, 1889.  It is
clear that it was not originally executed for the purpose
of covering this debt, but was, on the contrary, executed
with a view to obtaining other advances from the bank
for different purposes.  The negotiations for this loan
resulted in its rejection by the bank, and the mortgage
was returned to Mr. Linton without delivery.  How it
again got into the possession of the bank raises the cru-

cial question in the case so far as it concerns the delivery of the mortgage. Mr. Cooper seems to have transacted all the business on behalf of the bank; he was present at the trial, and we have his testimony. According to him, Mr. Linton, being heavily indebted, as already stated, and desiring further advances, offered to give security in the form of this mortgage. Mr. Cooper desired some assurance from Mrs. Linton that the arrangement was satisfactory to her. The conversation on this subject occurred October 18, 1889. Accordingly, Mr. Linton returned on October 21, bearing the following letter, which, it is admitted, was signed by Mrs. Linton:

"CABARSTON HOUSE, Oct. 18th, '89.

"SIR: My husband tells me that you are under the impression that I have trustees in America. The only one I have is for the property left me by my mother, which is all in Pennsylvania, and is now being contested, as I am advised by counsel that he has no right to hold the property, as the will was invalid. The whole of the Linton estate in Omaha belongs to my husband and myself. My husband has my authority to make arrangements with your bank about the property, and any arrangement made by him I will agree to. I am *not* an *American*, as Mr. Van Wagner stated, but a *British subject*, and all documents signed by me must be judged by the *English courts* alone.

"Believe me, truly yours,

ELWINA LINTON."

Relying on this letter Mr. Cooper accepted the mortgage on October 21, and on the faith thereof made a further advance to Mr. Linton of £3,800. These facts are denied by the Lintons. In order to explain their theory it is necessary briefly to recur to the former transactions. They claim that after the former negotiations had failed, the mortgage was returned to Mr. Linton. Colonel Finlay was during the summer in England; Linton was about, in his presence, to destroy the mortgage, when

Finlay dissuaded him. Negotiations were then in progress looking towards a loan of £50,000 on the security of Mrs. Linton's American property; abstracts and other documents had been placed in the hands of a Mr. Van Wagner, an American lawyer in London, for the purpose of procuring from him an opinion as to title, and as to the form of the securities, and Colonel Finlay desired to submit this mortgage to Mr. Van Wagner to ascertain whether is was in proper form for the securities which it was contemplated giving. An opinion was rendered by Mr. Van Wagner to Messrs. Janson, Cobb, Pearson & Co., solicitors, of London, and the papers returned to them. The mortgage in question happened thus to come into the hands of these solicitors, who represented Brown, Janson & Co., and in some way passed from them to the bank. A great deal of the evidence is devoted to tracing the mortgage between the time of its execution, in April, and the 21st of October. We need not inquire very closely into this, because we take it that although the mortgage was originally intended for another purpose and was not in fact delivered for its original purpose, still, if it came properly into the hands of Brown, Janson & Co. in October by delivery by the mortgagors with the intention of having it operate as security as alleged by the bank, it would be a valid instrument for that purpose. Mrs. Linton testified that she never authorized such a delivery. Mr. Linton testified that he never so delivered it. Ordinarily this would create such a conflict in the evidence that we would not be at liberty to disturb the finding of the trial judge thereon,—the credibility of witnesses being generally a matter for the determination of the triers of fact in the district court. This rule is not, however, so rigid as to compel us to accept the statement of a witness in the district court, where it is absolutely demonstrated to be false or mistaken. We would not be compelled to approve a finding that two and two make five, or that on a certain morning the sun rose in the west, although some witness may have

so testified and honestly believed it to be the fact.    The letter already quoted goes far to show that Mrs. Linton did at the time intend that the mortgage should be delivered, and that she granted to Mr. Linton full authority in the premises.    This letter is explained by both on the theory that they had in view the consummation of the larger loan, and that the letter referred to those negotiations and not to this mortgage.    Their subsequent conduct conclusively repels that theory.

Before referring to the evidence as to subsequent events it may be proper to say that the plaintiffs contend that the subsequent conduct of Mr. Linton could in nowise tend to bind Mrs. Linton.    Whether this is true, in view of the very broad and general authority conferred by the letter of October 18, we need not inquire. Mr. Linton's subsequent conduct and admissions were admissible in evidence for the purpose of impeaching his own testimony if for no other purpose.    On December 19 he addressed to Coates, Son & Co. a letter, in which he says: "If you will get me a loan of say £20,000, with which I can pay off my loan of Brown, Janson & Co. of £10,000 (of San Sebastians and £16,000 mortgages on the Omaha property), I will, besides handing you the above security, give you a further collateral security of," etc. There was executed in April not only the £10,000 mortgage, but also another of £6,000 not involved in this case, and the "£16,000 mortgages on Omaha property" could only have referred to these two.    February 3, 1890, he addressed to Mr. Shard, of the firm of Janson, Cobb, Pearson & Co., a letter, in the course of which he says: "My only objection to your putting the mortgage of the Omaha property on record is that it will destroy or interfere with our position there, as we have never had a mortgage on the property before, and it is only necessary for the bank to receive payment or further cover.    It does seem to me important that mortgage should not be upon record unless we are unable within the next few days to settle with the bank."    Some time, apparently

near the end of February, he again addressed Mr. Shard a letter, in which he says: "I am sorry you did not under-- stand me about the mortgage on the Omaha property. I have no objection to giving a new one properly dated. My wife thought Cooper wanted to take the Omaha prop- erty for the stocks." In March another letter to Mr. Shard says: "I sent you a wire this morning about the Omaha mortgage. My wife is of opinion that Colonel Finlay would raise trouble if it is recorded. The mort- gage was to have been for advances to be made. You cannot use it at present as cover." During the whole in- terval there was continued correspondence between him and Janson, Cobb, Pearson & Co. Letters on both sides referred to this mortgage as a subsisting incumbrance, and this last letter contains the first protest by Mr. Lin- ton on the subject. We are not certainly unreasonably reluctant to accept Mr. Linton's bare denial on the trial, in the face of these contemporaneous documents. With Mrs. Linton the case is no better. On April 2, 1890, Mr. and Mrs. Linton executed to Cooper and others a deed absolute in form on their property in Omaha, being the deed referred to in the statement of the case, and nowhere is the evidence of the defendants contradicted that the purpose of this deed was to replace the mortgage in suit. At the same time they wrote a letter intended to operate as a defeasance, beginning "We having to-day executed an absolute conveyance to three of your partners on three pieces of land at Omaha, it is understood that such land is to be held by you as security for all moneys at any time owing by us, or either of us, to you." On the 20th of May, 1890, the Lintons joined in a mortgage to Greenwell & Co., which, it recites, shall "charge the property hereto- fore described subject to a mortgage already existing thereon in favor of Messrs. Brown, Janson & Co., bankers of London, England, dated the 15th April, one thousand eight hundred and eighty-nine, for securing £10,000 and interest." This was followed by a covenant "that the aforesaid premises are unincumbered except as to the

above mentioned mortgage of the 15th of April, one thousand eight hundred and eighty-nine, to Messrs. Brown, Janson & Co. for £10,000." This mortgage to Greenwell & Co., it seems, was afterwards avoided by decree of the district court of Douglas county; but counsel err in assuming that the avoidance of the mortgage destroyed its probative force. It could not in any event operate as an estoppel in favor of Brown, Janson & Co. Whether valid or not, it was nevertheless a solemn and distinct admission by Mrs. Linton of the validity of the mortgage in suit. Somewhat later Brown, Janson & Co. instituted bankruptcy proceedings against Mr. Linton, and concerning these proceedings Mrs. Linton wrote them from Ostend August 6, 1891, a long letter, in the course of which she says: "The bank in London have two securities registered in Omaha against my estate, the two documents are for about £16,000. Mr. Shard holds the deeds of my property." In the face of these repeated admissions, formal and informal, it is impossible to believe that the mortgage did not pass into the hands of Brown, Janson & Co. with the intention on the part of both Mr. and Mrs. Linton to make it a valid security. In justice to the trial court we should say that the opinion of the district judge discloses that his decision was not based on any finding that the mortgage was not delivered, but was, on the contrary, based on his views as to the sufficiency of the consideration. The decree contains a finding that it was not delivered, and this finding must be, and is, accepted in the review of the case. The statement as to the opinion is made as a matter of fairness to the judge, and not as influencing our decision.

The mortgage was acknowledged before an official describing himself as consular agent. It is contended that such an official has no authority to take an acknowledgment, and that the deed being that of a married woman, a legal acknowledgment is necessary to its validity. In support of that proposition we are cited to numerous

authorities* in other states where the subject is governed by statutes not like ours, and which are therefore inapplicable. We are also cited to *Roode v. State*, 5 Neb. 174. In that case it was said that an instrument purporting to be the deed of a *feme covert* without her acknowledgment is void as to her. The deed there involved purported to be the conveyance of her husband and her name seems to have been inserted in it for the sole purpose of barring dower. For that purpose an acknowledgment is necessary. (Compiled Statutes, ch. 23, sec. 12.) An acknowledgment is also essential for the purpose of conveying a homestead. (Compiled Statutes, ch. 36, sec. 4.) For other purposes an acknowledgment is not in this state necessary as between the parties to an instrument. (*Stevenson v. Craig*, 12 Neb. 464; *Missouri Valley Land Co. v. Bushnell*, 11 Neb. 192; *Kittle v. St. John*, 10 Neb. 605; *Weaver v. Coumbe*, 15 Neb. 167; *Connell v. Galligher*, 39 Neb. 793; *Horbach v. Tyrrell*, 48 Neb. 514.) Except in the special instances referred to, the office of an acknowledgment is twofold merely: to entitle the instrument to record, and to permit its admission in evidence without further proof of its execution. (*Burbank v. Ellis*, 7 Neb. 156; *Horbach v. Tyrrell, supra*.)

It is argued that without an acknowledgment the mortgage should not have been received in evidence; but the statute merely makes a proper acknowledgment sufficient proof to admit the instrument, and it does not make that method of proof exclusive. An unacknowledged instrument, as shown by the cases already cited, may be received in evidence, provided its execution and delivery be proved, as they were in this case. The married woman's act (Compiled Statutes, ch. 53, sec. 2) provides that a married woman "may bargain, sell, and convey her real and personal property, and enter into any contract

*Clark v. Graham*, 6 Wheat. [U. S.] 577; *Runfelt v. Clemens*, 46 Pa. St. 455; *Warren v. Brown*, 25 Miss. 73; *Clark v. Thompson*, 12 Pa. St. 274; *Graham v. Long*, 65 Pa. St. 385; *Tully v. Davis*, 30 Ill. 103; *Myers v. Boyd*, 96 Pa. St. 427; *Rogers v. Adams*, 66 Ala. 600; *Dewey v. Campau*, 4 Mich. 565; *Buell v. Irwin*, 24 Mich. 145; *Keller v. Moore*, 51 Ala. 340.

with reference to the same in the same manner, to the same extent, and with like effect as a married man may in relation to his real or personal property." Under the authorities cited there can be no doubt then that the deed or mortgage of a married woman of her separate estate is valid between the parties although not acknowledged. The validity of this acknowledgment is, therefore, not a question necessary to be decided.

We now come to the question of the consideration. The condition of the mortgage names no time for the payment of the debt. It may be assumed that it was due presently, or upon demand, and that there was, therefore, no consideration by way of extending time on the antecedent debt of the husband. The defendants contend, however, that on the faith of the mortgage there was an advancement made upon its delivery of £3,800, and that there were two other comparatively small loans made at a later period. The plaintiffs show conclusively that at the time of the delivery of the mortgage Mr. Linton's current account was overdrawn about £2,300 and that, of the £3,800 passed to Linton's credit on the delivery of the mortgage, £2,300 was absorbed in covering this overdraft. This, without an extension of time, was not a new consideration. They further contend that of the remaining £1,500, £1,000 represented the profits accruing to Linton from a sale that day made of stock held by him in the Imperial Bank of Persia; that £500 was the result of a discount or purchase of a "sold note" of Coates, Son & Co. of stock in the Pahang Exploration Company; that of the two later advances one was a similar transaction in the stock of the United States Debenture Corporation, and the other in shares of the Canadian Meat Company. There is evidence fairly tending to sustain all these assertions, and they meet but a qualified denial from Mr. Cooper. It must, however, be remembered that if the mortgage was delivered at all, it was as a general cover for past debts and future advances; and every one of the subsequent transactions is of such a character that it is

hardly probable that the bank would enter into it with a man already deeply in debt to them, as was Mr. Linton, without further security than the items to which they severally relate. The Persian stock transaction was this: Linton was about to go on the Continent and desired to dispose of the Persian stock before he went, as it was then at a considerable premium. It was ascertained that he could close it out at a profit of £1,250. Brown, Janson & Co. desired to make the sale for him, as they had arrangements by which they could divide the commissions with the brokers, and thus realize a profit to themselves. Linton proposed that they give him credit for £1,000 and accept the remaining £250 as the commission to be so divided. This was done, and the £1,000 immediately passed to his credit. While this was perhaps a very short loan, it was, in effect, a discount of his profits, because it was done before the sale was made and the proceeds realized. With regard to the "sold note," the transaction was that the sold note was immediately delivered and its amount placed to Linton's credit. It would seem from the evidence that it was not realized on by Brown, Janson & Co. for some weeks, and was then short a few pounds of the amount advanced. The Debenture Company transaction seems to have been an absolute loan to Linton on behalf of a friend with the understanding that the shares bought with the money should be deposited as collateral. Linton says he does not know whether this was done. The Canadian Meat Company item was a similar transaction. Thus, while Brown, Janson & Co. obtained, or were to obtain, other security for each of these items, they were all, in effect, advances, and, as we said, such advances as would hardly be made on behalf of a man who already owed more than £12,000 largely unsecured. The security afforded by the £10,000 mortgage was the inducement to make these advances, according to the testimony of Cooper, and even according to Linton there must have been some close connection between them, because in spite of the efforts

of his counsel to draw out from him his story with regard
to the £1,000 and £500 of October 21 as separate transac-
tions, his mind worked in such a manner that he kept
reverting to Cooper's demand for a letter from Mrs. Lin-
ton authorizing him to act with reference to the Omaha
property, and he over and over again states the facts in
regard to the procurement of that letter as if they were
inseparably connected in his mind with the procuring of
the advances.    The law on the subject is not difficult.
It is settled that a married woman may become surety
for her husband, and that a present advance or the ex-
tension of an antecedent debt is a sufficient consideration
for her so doing.    (*Stevenson v. Craig, supra; Buffalo
County Nat. Bank v. Sharpe*, 40 Neb. 123; *Smith v. Spauld-
ing*, 40 Neb. 339; *Briggs v. First Nat. Bank of Beatrice*, 41
Neb. 17; *Watts v. Gantt*, 42 Neb. 869.)    But there must be
a new consideration if the mortgage be given to secure
an antecedent debt.    (*Kansas Mfg. Co. v. Gandy*, 11 Neb.
448.)

The trial court seems to have viewed the facts as we
do, but proceeded on the theory that a subsequent pay-
ment had been made sufficient to discharge any indebted-
ness created at the time, or after the mortgage was given;
that it was therefore discharged.    In this we think there
was error.    It would seem that the rule for the applica-
tion of payments, where no direction is given by the
debtor and no special application has been made by the
creditor, is directly contrary to that applied by the trial
judge; and payments should be applied first to the satis-
faction of the earlier debits.    (Norval, J., in *State v. Hill*,
47 Neb. 456.)    But irrespective of this, there was a con-
fusion by the trial judge between the consideration for
giving the mortgage and the debt secured thereby.    The
debt secured was the whole of the debt of Linton to the
bank, past and future, to the extent of £1,000.    The new
consideration was present and future advances, and the
repayment of such present and future advances did not
defeat the consideration which had by such advances

already been executed, nor did it discharge the mortgage. To reduce this transaction to its simplest form will at once elucidate our meaning. If A owes B $100, which is not secured, and if C agrees that if B will lend A a further sum of $5, C will pledge his property as security for the $100 already owed, the further advance is a new consideration which will sustain the pledge, which can then only be discharged by the repayment of the $100.

There is a final contention that no part of the consideration passed to Mrs. Linton, and that the contract was not made with reference to her separate estate. No discussion is needed to dispose of this argument. The cases already cited show that she need not be a party to the consideration, and the mortgage itself was an express charge on her separate estate.

The judgment of the district court is reversed, and the case is remanded with directions to take an account of the amount due from Linton to the bank, and enter a decree of foreclosure for an amount in money of the United States equivalent to that debt, but not exceeding £10,000, with interest at six per cent from October 21, 1889.

REVERSED AND REMANDED.