FIORO NICOLA DONDERO AND ZIDI DONDERO, AS EXECUTORS OF THE LAST WILL AND TESTAMENT OF ARCANGELO DONDERO, DECEASED, AND EMILIA PARMIGIANO, FORMERLY MRS. EMILIA DONDERO, AND DOMINICO PARMIGIANO, HER HUSBAND, APPELLANTS, v. FELIX TURRILLAS AND AGUEDA TURRILLAS, HIS WIFE, AND JOHN DOE AND RICHARD ROE, RESPONDENTS.

No. 3269

October 4, 1939.

94 P. (2d) 276.

*Morley Griswold, George L. Vargas* and *George L. Sanford,* for Appellants:

*W. M. Kearney* and *Robert Taylor Adams,* for
Respondents:

## OPINION

By the Court, ORR, J.:

Appellants brought an action in the Second judicial district court of the State of Nevada, asking restitution of certain premises hereinafter described. Respondents answered and asked that appellant be required to perform in accordance with what they allege to be an agreement for a lease. The trial court entered its judgment ordering appellants to execute a lease in the form prescribed by the court in its findings. Appellants refused to execute the lease as prescribed, and thereupon the clerk of the court, responsive to an order thereof, executed the lease and delivered it to respondents. From the judgment and order of the lower court this appeal is taken.

The facts, insofar as they are necessary to be stated, are:

On May 29, 1926, Arcangelo and Emilia Dondero, husband and wife, leased to Felix Turrillas and wife and John Etchebarren and wife, for a term of ten

years, the premises known as the Commercial Hotel, consisting of lots and buildings thereon, at 207–209 N. Center street, Reno, Nevada. Subsequent to the making of the lease Arcangelo Dondero and Emilia Dondero were divorced, and Arcangelo Dondero conveyed a one-half interest in the premises to Emilia Dondero, and she now holds such half interest. Later Emilia Dondero married Dominico Parmigiano; they are now husband and wife. Arcangelo Dondero died in 1931 and left by will his undivided one-half of said property to his sons, Fioro and Zidi, as a life estate for and during their lives, and then to their sons, if any. The will named Fioro and Zidi as executors. They qualified and remain as executors of the estate.

The lease of 1926 was in 1931 assigned to The Northern, Inc., a corporation. And said lease was in 1936 extended to February 1, 1938, a period of twenty months. The extension was given by Fioro and Zidi Dondero, executors of the Arcangelo Dondero Estate, for a one-half interest, and by Emilia Dondero Parmigiano for the other one-half interest.

For some months just prior to the time the extension was to expire, appellants and respondents discussed the question of a further renewal or a new lease. As the time for the expiration drew near, Turrillas became concerned and was insistent that an agreement be reached or a renewal refused, and in case of a refusal, that such be made in sufficient time to allow him to remove his fixtures and other property from the premises.

On the 15th day of January 1938 Zidi Dondero and Mrs. Parmigiano talked to Turrillas, and later in the day Mrs. Parmigiano telephoned Fioro Dondero, who is a resident of Carson City, to come to Reno. Upon the arrival of Fioro in Reno he met his mother and they went to the home of Zidi and had a discussion with him. Later that evening Fioro and Mrs. Parmigiano went to the premises occupied by Turrillas, at which time the question of the new lease was discussed. As a result of the conference, a certain writing was made by Fioro

Dondero and signed by Fioro and Mrs. Parmigiano, and this writing was delivered to Turrillas with the understanding that the said writing was to be, on Monday, the 17th, delivered to Morley Griswold. The agreement is as follows:

"January 15, 1938.

"Morley Griswold
   "Attorney at Law
   "Reno, Nevada.
"Dear Morley:

"We have reached an agreement on this lease of the building at 207 and 209 North Center Street and the one story bldg in the rear, for a term of ten years, beginning on February 1, 1938. The rental shall be at the rate of $350.00 per month for the first five years and $400.00 per month for the last five years of the term of the lease. Felix Turrillas the party who is to rent the premises is to pay you on Monday January 17, 1937 the sum of Nineteen Hundred fifty & $\frac{no}{100}$ ($1950.00) Dollars. Of which sum $350.00) is to apply as rental for the month of February 1938 and sixteen Hundred & $\frac{no}{100}$ ($1600.00) is to apply as security of the lease and is to be applied to the last four months of the term of the lease if the terms and provision of the lease are faithfully performed and if not faithfully performed the said sum of sixteen hundred dollars shall be forfeited to the lessors. Some of the provisions of the lease are to be as follows. Felix Turrillas is to make permenant improvements to the premises during the next few months; to include a new front and removal of the posts in the ground floor and place substantial beams and to raise the ceiling to its former level to the extent of about 2 to 3 inches. In other words, at the time some of the old posts in the ground floor were removed the ceiling dropped at the rear end of the building to the extent of about 2 to 3 inches. The improvements are to be made in *in* good substantial and

workman like manner; plans to be made by a certified architect & approved. Felix is to close the deal Monday, January 17, 1937 by placing in your hands the ($1950.00) above specified. If this sum is not paid then the option is void and of no value. You draw up the lease papers on about the same order of the old lease, the one made by my father and mother a copy of which I will mail to you special delivery Sunday January 16, 1938. Felix has agreed to make improvements at his own expense and therefor any such improvements are to remain the property of the lessors. We are to be priviledged to place a non liability notice on the building & etc. My mother and Felix Turrillas will be at your office on Monday January 17, 1938 to close the deal. Trusting I have made this matter clear I remain

"Yours truly

"Emilia Dondero in Parmigiano

"F. N. Dondero."

The testimony further discloses that Fioro, at the time of signing the memorandum, represented that he was acting for his brother and his coexecutor, Zidi. This was testified to by Felix Turrillas, Frank Normandy, and Louis Sarasua, and they also testified that the statement was made in response to a query made by Turrillas as to the whereabouts of Zidi. The testimony is to the effect that upon the making of such inquiry Fioro produced from his pocket a writing which he stated to be a power of attorney from his brother Zidi. The paper was read by Turrillas and returned to Fioro. The witnesses Normandy and Sarasua did not read the writing, but heard the statements of Fioro. Turrillas testified that he had read the writing and that it stated: "Whatever you, Fioro Dondero, and my mother, Mrs. Parmigiano, agree with Felix Turrillas is O. K." Turrillas testified that there were two copies of the memorandum hereinabove set out, one was handed to Turrillas, and the other was retained by Fioro, to be by him sent to Mr. Griswold.

On Monday, January 17, 1938, Turrillas, Zidi Dondero, and Mrs. Parmigiano met at the office of Mr. Griswold and had a conference with him, at which time the question of drawing up a form of lease was discussed. Mr. Griswold testified that he at the time had in his possession a letter from Fioro Dondero, he, Fioro, not being present; which said letter, according to the memory of Mr. Griswold, gave instructions as to Fioro's desires in the preparation of a form of lease. The $1,950 mentioned in the memorandum was by Turrillas delivered to a stenographer in Griswold's office on Monday morning January 17, 1938. Mr. Griswold, being busy at the time, informed the parties that he would draw a lease within a few days and would advise them when the draft was ready.

About four weeks later Turrillas received a form of lease from Griswold, which he, Turrillas, refused to sign because he did not believe it conformed to the memorandum and the terms contained in the old lease and conversations had with Fioro and Zidi Dondero and Mrs. Parmigiano. Later Mr. Kearney, acting for Turrillas, prepared a form of lease, which was submitted to appellants and which they refused to sign.

In their opening brief appellants present eleven points. Respondent, in his reply, condenses these to six. We like the more ultimate compression of the issues into the three points appellants have made in their closing brief, and will endeavor to dispose of the questions as therein stated.

First it is contended by appellants that a married woman must acknowledge her agreement to lease her separate property.

The first legislative enactment in Nevada touching upon acknowledgments by married women was in 1861, and reads as follows:

"SECTION 1. Conveyances of lands, or of any estate or interest therein, may be made by deed, signed by the person from whom the estate or interest is intended to

pass, being of lawful age, or by his lawful agent or attorney, and acknowledged or proved, and recorded, as hereinafter directed.

"SEC. 2. A husband and wife may, by their joint deed, convey the real estate of the wife in like manner as she might do by her separate deed, if she were unmarried.

*     *     *     *     *

"SEC. 19. A married woman may convey any of her real estate by any conveyance thereof, executed and acknowledged by herself and her husband, and certified, in the manner hereinafter provided, by the proper officer taking the acknowledgment.

"SEC. 20. No covenant, express or implied, in any such conveyance, shall bind such married woman or her heirs, except so far as may be necessary effectually to convey, from such married woman and her heirs, all her rights and interest expressed to be conveyed in such conveyance.

"SEC. 21. Any officer authorized by this act to take the proof or acknowledgment of any conveyance whereby any real estate is conveyed, or may be affected, may take and certify the acknowledgment of a married woman to any such conveyance of real estate.

"SEC. 22. No such acknowledgment shall be taken, unless such married woman shall be personally known, to the officer taking the same, to be the person whose name is subscribed to such conveyance as a party thereto, or shall be proved to be such by a credible witness; nor unless such married woman shall be made acquainted with the contents of such conveyance, and shall acknowledge on an examination, apart from and without the hearing of her husband, that she executed the same freely and voluntarily, without fear or compulsion, or undue influence of her said husband, and that she does not wish to retract the execution of the same.

"SEC. 23. The certificate shall be in the form heretofore given, and shall set forth that such married woman

was personally known, to the officer granting the same, to be the person whose name is subscribed to such conveyance as a party thereto, or was proved to be such by credible witness, whose name shall be inserted in the certificate, and that she was made acquainted with the contents of such conveyance, and acknowledged, on examination apart from and without the hearing of her husband, that she executed the same freely and voluntarily, without fear or compulsion, or undue influence of her husband, and that she does not wish to retract the execution of the same. Every certificate which substantially conforms to the requirements of this act shall be valid." Stats. 1861, c. 9, pp. 11, 14.

In 1873 the husband and wife act was passed, the relevant portions of which are:

"§ 32. No estate in the real property a married woman possesses is affected by any conveyance or other instrument, except a will purporting to be executed or acknowledged by her, unless the same be acknowledged by her in the manner that conveyances by married women are required to be acknowledged.

"§ 33. A power of attorney of a married woman, authorizing the execution of an instrument conveying or affecting her real property, shall be acknowledged as above mentioned.

"§ 34. A conveyance or other instrument affecting or relating to real estate, except a will made by a married woman, has no validity until acknowledged as above provided; but when so acknowledged has the same effect as if she were unmarried."

Sections 3386, 3387 and 3388 N. C. L.

In 1909 the conveyance act was amended (chapter 195). Sections 19, 22, and 23, above quoted, were repealed, and section 2 was amended to read: "A conveyance by a married woman has the same effect as if she were unmarried and may be acknowledged in the same manner."

Said section is now section 1476 N. C. L.

In the amendment of 1909 it was also provided, in

section 6 as follows: "All acts and parts of acts in conflict herewith are hereby repealed."

■ The statutory changes in Nevada, as in many states, establish a purpose to emancipate married women from the encumbrances with which they had been surrounded in the disposition of their separate property. Before the amendment of 1909, the law considered her as laboring under certain disabilities, and that she should therefore be protected in the exercise of her right to alienate her property, such asserted protection being that the husband join in the conveyance and that her acknowledgment be made separately and apart from him. As was said in Jenkins v. Pittsburg & C. R. Co., 210 Pa. 134, 59 A. 823: "The purpose of the act of 1770 was twofold: First, to prevent the wife from selling her land without the husband's consent; secondly, to prevent compulsion on her to make sale against her real willingness. The first object was secured by her husband's joinder in the deed, the second by the separate examination and acknowledgment of the wife."

The amendment of 1909 struck from the conveyance act those provisions which recognized a disability on the part of a married woman, and plainly evidences an intention to place married women on the same footing, with the same free agency as to the disposition of her separate property, as enjoyed by unmarried women in relation to their property. The legislation was responsive to and in accordance with an enlightened public opinion recognizing the intelligence and independence of married women, discarding the view theretofore existing that by taking the marriage vow a married woman lost much of the intelligence and all of the independence which had been hers prior to that time; or, if she did not lose those attributes, they became suspended during coverture. An examination of the act of 1909 as amended clearly demonstrates that the object was to completely emancipate married women in the disposition of their property, and in reading that act

the purpose and results are clear. But, say appellants, you cannot resolve this question alone on the act of 1909 as amended; there still exist sections 3386 to 3388 N. C. L. which can and should be read in connection with the amendatory act of 1909, and if those sections be so read and the necessary meaning given them, then a married woman would be required to acknowledge her conveyance in order to give it effect. In urging this construction appellants rely strongly upon the case of Loupe v. Smith, 123 Cal. 491, 56 P. 254. The California law prior to 1891 contained the usual so-called safeguards relative to conveyances by married women. In 1891 certain amendments were made. Stats. 1891, p. 137. Section 1186, providing for a separate examination, was repealed; and section 1191, providing the form of the certificate, was repealed; section 1093 was left, and reads as follows: "No estate in the real property of a married woman passes by any grant purporting to be executed or acknowledged by her, unless the grant or instrument is acknowledged by her in the manner prescribed by sections eleven hundred and eighty-six and eleven hundred and ninety-one." Section 1187 read as follows: "A conveyance by a married woman has the same effect as if she were unmarried, and may be acknowledged in the same manner, except as mentioned in the last section; but such conveyance has no validity until so acknowledged." The California legislature amputated from section 1187 the words: "except as mentioned in the last section; but such conveyance has no validity unless so acknowledged." The California court amputated from section 1093 the words: "in the manner prescribed by sections eleven hundred and eighty-six and eleven hundred and ninety-one." And the court then took the remaining portions of the two sections, read them together, and found a meaning therein.

Appellants ask us to bring over from the act of 1873 section 3386 to 3388 and read them in connection with section 1476 N. C. L., harmonize them, and give them

effect. We could do this and a meaning would be found. Our operation, however, would be by grafting rather than amputation. But we conclude that the grafted sections would sap from the 1909 act the legislative intent and purpose and leave said act, in part at least, as a judicially constructed reversion to the antiquated theory of the incompetence of married women. If we give the effect to the different sections appellants contend for, there remains a requirement of a mere form of acknowledgment by married women. What purpose could be accomplished by such construction? It would furnish none of the protection theretofore sought to be afforded, namely the prevention of compulsion or receiving the husband's consent. It would do violence to the plain intent of section 2 of the act of 1909, in that the conveyance of a married woman would not have the *same effect* as that of an unmarried woman until she had acknowledged it, something which the legislature did not say and clearly something which it did not intend. Appellants contend that in adopting their theory we would not change the effect of the conveyance, but merely the form. We think the equality intended by the legislature went both to form and effect.

■ Many cases have been cited by respondents wherein language similar to that used in section 2 of the act of 1909 has been held to impliedly repeal any requirement for an acknowledgment by a married woman. The following cases so hold, and while in some instances the statutes are different, the reasoning remains the same and supports the contention of respondents that the act of 1909 as amended repeals by implication sections 3386, 3387, and 3388 N. C. L., and such is our opinion: 1 C. J. 769, par. 41; 1 C. J. 825, par. 151; Criscoe v. Hambrick, 47 Ark. 235, 1 S. W. 150; Roberts et ux. v. Wilcoxson & Rose, 36 Ark. 355; Miller v. Fisher et al., 1 Ariz. 232, 25 P. 651; Charauleau v. Woffenden, 1 Ariz. 243, 25 P. 652; Knight v. Lawrence, 19 Colo. 425, 36 P. 242; Stewart v. Weiser

Lumber Co. et al., 21 Idaho 340, 121 P. 775; Knudsen v. Lythman, 33 Idaho 794, 200 P. 130, 131; Knight v. Paxton, 124 U. S. 552, 8 S. Ct. 592, 31 L. Ed. 518; Munger v. Baldridge, 41 Kan. 236, 21 P. 159, 13 Am. St. Rep. 273; Morris v. Linton, 61 Neb. 537, 85 N. W. 565; Linton v. Cooper, 53 Neb. 400, 73 N. W. 731; Adkins v. Arnold, 32 Okl. 167, 121 P. 186; Hayes v. Frey et al., 54 Wis. 503, 11 N. W. 695; Jenkins v. Pittsburg & C. R. Co., 210 Pa. 134, 59 A. 823; Bailey v. Cooney et ux., 284 Pa. 508, 131 A. 480; Ball v. Bullard, 52 Barb., N. Y., 141.

In reaching the above conclusion we have given due attention to the rule that repeals by implication are not favored. But to our minds there is such inconsistency and repugnancy between the statutes as to preclude the presumption against an intention to repeal. As has been said, this inconsistency and repugnancy arises between the plain intent of the legislature to strike out all impediments to as free exercise of the right to convey by a married woman as if she were unmarried, and the retention of an impediment if sections 3386 to 3388 N. C. L. are given effect. Since 1909 the conveyance by a married woman of her separate property has not required an acknowledgment to make it effective.

Zidi Dondero, one of the executors, did not sign the memorandum heretofore mentioned. Appellants contend that section 9632 N. C. L. required the signature of both of the executors in order to make the memorandum effective. Said section reads as follows: "When all the persons named as executors or executrixes shall not be appointed by the court, such as shall be appointed shall have the same authority to perform every act and discharge every trust required by the will, and their acts shall be effectual for every purpose as if all had been appointed, and should act together. When there are two executors or administrators the acts of one alone shall be valid if the other is absent from the state, or

for any cause is laboring under any legal disability, and when there are more than two, the act of a majority shall be sufficient."

It is conceded that at the time of the execution of the memorandum Zidi Dondero, one of the executors, was present in the State of Nevada and was not at the time under disability.

■ We believe the rule to be that the requirement in the statute for joint activity means the joint exercise of discretion and judgment; and while such statute forbids the delegation by one coexecutor to another of such power, when a coexecutor has exercised such discretion and judgment in a given matter, he can authorize his coexecutor to perform acts necessary to carry the purpose determined upon into effect. The following cases sustain that view: Nelson v. Carrington, 4 Munf. 332, 18 Va. 332, 6 Am. Dec. 519; Ward v. Koenig, 106 Md. 433, 67 A. 236; Becker v. Nat. Bank, Tex. Civ. App., 286 S. W. 889.

■ The trial court found that Zidi Dondero was an active participant in the negotiations leading up to the execution of the memorandum; that is, that he had on different occasions talked to Turrillas, and that on the day that the memorandum was signed, Mrs. Parmigiano telephoned to Carson City asking Fioro to come to Reno for the purpose of consultation relative to the execution of a lease; and that upon the arrival of Fioro in Reno, he, Fioro, and Mrs. Parmigiano went to the home of Zidi and had a conversation with him, later going to the Northern for the purpose of conferring with Turrillas; that at that time Fioro represented to Turrillas that he was acting for and on behalf of Zidi. Also the trial court found—and there is in the record substantial evidence to sustain such finding—that Zidi had exercised the judgment and discretion vested in him by the statute, that he was aware of the proposals which had been made, and that in signing the memorandum Fioro acted not only for himself but for Zidi and for the estate.

■ Appellants complain as to the character of the

evidence produced to establish this finding, but we see no valid reason why the consent of an executor not signing cannot be shown by means other than his actual signature to a document. Proof of participation and consent in the making of the agreement, and the delegation of authority to sign for him, can be shown and demonstrated by acts and conduct, without recourse to an instrument in writing. True, the latter method is more satisfactory, being instantly apparent; but proof of the exercise of judgment and participation in and consent to the contract is the ultimate question to be determined, and competent proof establishing such fact is to be considered, though it may not be the most concrete and conclusive that could have been made available.

Appellants draw attention to the similarity of the California statute and the Nevada statute before it was amended to read in its present form. Formerly the Nevada statute authorized the delegation of authority if given under seal, and the California statute authorizes the delegation of power from one executor to another in writing. In the amendment of the Nevada law the legislature dropped the provision for the delegation of power, and appellants contend that the significance of such omission in the amended statute is that the law of Nevada now requires coexecutors, under a situation as exists in this case, to act in all particulars. However, we believe that the position of appellants is too inclusive; they are correct in their assertion that both must act, but that requirement, as we have pointed out, is confined to the exercise of judgment and discretion. In the case of Roe v. Smith, 42 Misc. 89, 85 N. Y. S. 527, the head note reads: "Where two executors were authorized by will to sell the lands of the estate as trustees, a written, unsealed agreement, purporting to be that of such executors, signed by one only of them, who had been authorized by the other executor to act for him in signing the contract, is enforceable."

In the opinion the court states:

"The one being authorized by the other, his signing

binds both, the contract not being under seal. It is the same as the case of an agent signing his own name instead of that of his principal to an executory contract; the principal is bound, and oral evidence to prove that he authorized the agent to sign is not excluded by the statute of frauds. Briggs v. Partridge, 64 N. Y. 357, 21 Am. Rep. 617.

"The rule that delegated authority involving the exercise of judgment and discretion cannot be redelegated is not in the way. The trust authority to agree to sell was not delegated; no exercise of judgment and discretion was delegated; only the formal signing was delegated after the terms of the contract had been agreed upon."

See, also, Mobley v. Mobley, 149 Md. 401, 131 A. 770; Mechem on Agency (2d ed.), par. 315. I.

■ Appellants next contend that the letter to Morley Griswold as their attorney, signed by Mrs. Parmigiano and Fioro Dondero, is not a contract between them and the third party, who did not sign. The parties had been negotiating for some time concerning a new lease, and, as hereinbefore stated, on the evening of January 15, 1938, Fioro was acting for Zidi. The memorandum was sufficient without the signature of Turrillas. The letter and its reference to the old lease contains the terms of the bargain. Williston on Contracts, p. 1664, states: "So a letter written by the party to be charged to his own agent, or to any other third person, is sufficient if it contains the terms of the bargain." Citing many cases and Restatement of Contracts, par. 209, illustration 1.

The reference made to the restatement reads:

"It is not essential to the validity of a memorandum under the statute that the writing shall have been made as a memorandum of a contract.

"Illustration: 1. A and B enter into an oral contract by which A promises to sell and B promises to buy a specific automobile for $2,000. A writes and signs a letter to his friend C, containing an accurate statement

of the contract which he has made. The letter is a sufficient memorandum to charge A."

As indicated above, the writing need not be made to the other party to constitute a memorandum. The general rule is stated in 27 C. J. 301, par. 386, as follows: "A letter or telegram sufficient as to contents and signature to constitute a memorandum satisfying the statute of frauds, or a part of such memorandum if more than one writing is involved, is adequate for this purpose, even though it is not intended for, addressed, delivered or known to the other contracting party. Where the party sought to be charged has admitted the contract in writing over his signature, the statute is complied with, no matter to whom the writing may have been addressed. The writing is equally corroborative whether it passes between the parties to the contract or between one of them and another person."

In the case of Riddle State Bank v. Link, et al., 78 Or. 498, 153 P. 1192, the name of one was signed to an agreement of purchase; two others were in fact purchasers with him, but were not mentioned in the agreement. Parol evidence was held admissible to show that the other two were parties. At page 1193 of 153 P. the court stated: "The parol evidence tending to show that the written contract executed by Link was in fact the contract of all three, was properly admitted."

See, also, Smith v. Campbell, 85 Or. 420, 166 P. 546; Blomquist v. Jennings, 119 Or. 691, 250 P. 1101, 1103; Lewis v. Aronow, 77 Mont. 348, 250 P. 146, 148.

It is contended by appellants, basing their statement upon the diverse terms of a proposed lease furnished by Mr. Griswold, acting for appellants, and a proposed lease furnished by Mr. Kearney, acting for respondents, that the court found a lease differing in terms from the understanding had by either of the parties. Doubtless the terms incorporated by Mr. Griswold and Mr. Kearney in their proposed leases were influenced by statements made to them by their clients. But the court found the terms of the lease which it ordered, from an

unbiased consideration of the evidence presented. All the terms were contained in the memorandum and by reference to the old lease.

It is contended also that the memorandum was merely preliminary and that it was contemplated by the parties that something yet was to be done, that further conferences were to be had. But the trial court further found from substantial evidence that on the evening of January 15, 1938, the parties reached an agreement, and that the essential terms thereof were embodied in the memorandum and in the reference to the old lease.

Much of their controversy revolves about the claim of appellants that respondents were to place in the hotel a heating system, and it is also deducible from the evidence that this heating system would cost in the neighborhood of $10,000. It is rather surprising to us, as it must have been to the trial court, that, if this was to have been one of the terms, it was overlooked in the provisions incorporated in the memorandum. That would have been one of the most important items under consideration, involving as it did such a large sum, and would have been foremost in the minds of Fioro and Mrs. Parmigiano that evening.

And, again, as to the conference had in Mr. Griswold's office, the trial court in its decision makes the very pertinent observation that the evidence does not disclose a serious disagreement at that time, and that the conference was on a friendly basis. Certainly if an expenditure such as the installation of a heating plant was insisted upon, it could well be expected that the relations at the said meeting would not have been so harmonious.

The memorandum and its reference to the old lease is, to our minds, sufficient to satisfy the statute of frauds. Sections 1529 and 1530 N. C. L., the Nevada statute of frauds, read:

"§ 1529. Every contract for the leasing for a longer period than one year, or for the sale of any lands, or any interest in lands, shall be void, unless the contract,

or some note or memorandum thereof, expressing the consideration, be in writing, and be subscribed by the party by whom the lease or sale is to be made.

"§ 1530. Every instrument required to be subscribed by any person under the last preceding section may be subscribed by the agent of such party lawfully authorized."

From what we have said before, it will be noted that in our opinion all of these requirements have been met.

Mention is made in the briefs that no order of court was secured authorizing a lease. Respondents object to the consideration by us of this point for the reason that it is raised here for the first time. In this contention respondents must be sustained.

Such information as we have as to the terms of the will and proceedings in the estate is taken from the briefs and not from the record, which is silent in respect thereto. Under stipulation, the lower court was enabled to take judicial notice of the estate proceedings. We are not privileged to do so.

No error appearing in the record, it is ordered that the judgment and order appealed from be and they are hereby affirmed.